UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Stanley Tolin and Jeffrey Stark, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>STANDARD & POOR'S FINANCIAL SERVICES, LLC and THE McGRAW HILL COMPANIES, INC.,<br><br>     Defendants. | No. 34'EX'': : 64'RCG GEH'ECUG "<br><br>CLASS ACTION COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Stanley Tolin and Jeffrey Stark 0("Plaintiffs") submit this class action complaint by and through their undersigned counsel, and make the following allegations upon information and belief, except as to those allegations specifically pertaining to Plaintiffs, which are predicated upon the investigation undertaken by Plaintiffs' counsel.

## NATURE OF THE ACTION

1. This is a shareholder class action brought by Plaintiffs on behalf of themselves and all other similarly situated shareholders of Fannie Mae Non-Cumulative Preferred Stock, Series T ("Rated Stock") against credit rating agency The McGraw-Hill Companies, Inc. and its wholly-owned and controlled business division Standard & Poor's Financial Services, LLC (collectively "S&P") for violations of New York law.

2. Fannie Mae marketed and sold the Rated Stocks to unsuspecting Class members as a safe investment that would provide Class members with an 8.25% dividend per year.  In order to persuade investors that the Rated Stocks were a safe investment, Fannie Mae included in

its offering circular an S&P rating that was designed to induce investors into purchasing the Rated Stock as a safe investment.

3.       In May 2008 Fannie Mae issued an Offering Circular for the Rated Stocks to be sold for $25 per share.  The Offering Circular included "AA-" rating from S&P.  According to S&P this rating means that the Rated Stocks had a "very strong capacity to meet its financial commitments" and the AA rating differs "only to a small degree" from the highest AAA rating.

4.       The S&P rating contained in the Offering Circular was an essential element to investors when choosing to invest in the Rated Stocks.

5.       Furthermore, throughout the Class Period (defined below), S&P continued to represent the Rated Stock as "AA-" on the Standard & Poor's Rating Service website.

6.       The 8.25% annual divided was reflective of the AA- rating provided by S&P. Absent this solid rating, investors would not have invested in the Rated Stock or would have demanded a higher dividend at a higher cost to Fannie Mae.

7.       As such, the S&P rating was a key element that allowed Fannie Mae to provide the Rated Stock to investors at the offered rate of return.

8.       The S&P rating was equally critical to investors who sought a safe investment vehicle.

9.       By placing its AA- rating on the Rated Stock S&P intentionally, recklessly and/or negligently made false and misleading statements that misled investors about the Rated Stock.

10.      As a result of S&P's false and misleading AA- rating made throughout the Class Period, Plaintiffs and other members of the Class purchased the Rated Stocks.

11.      On September 6, 2008, after Plaintiffs and other members of the Class purchased the Rated Stocks relying on S&P's AA- rating, the United States Government placed Fannie Mae

2

in conservatorship and stopped all preferred dividend payments to buyers of Fannie Mae preferred stock, including the Rated Stock.

12.     As a result, the per share price of the Rated Stock plummeted more than 88% from its initial offering price of $25 per share on May 13, 2008, to $3 per share on September 8, 2008. In addition the promised annual dividend ceased.

13.     S&P knew or should have known that its rating was false and misleading when made and that investors would reasonably rely on its published rating in making a decision to purchase the Rated Stock.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  The amount-in-controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and there is minimal diversity because certain members of the Class are citizens of a different state than any defendant as required by 28 U.S.C. § 1332(d)(2).

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants improper conduct alleged in this complaint occurred in, was directed from, and/or emanated from this judicial district.

## PARTIES

16.     Plaintiff Jeffrey Stark purchased 1,000 shares of the Rated Stock on May 13, 2008 for $25.00 per share.

17.     Plaintiff Stanley Tolin purchased 1,000 shares of the Rated Stock on July 10, 2008 for $20.47 per share.

18.   Defendant The McGraw-Hill Companies, Inc. is a New York corporation with its principal place of business in New York, New York.  The McGraw-Hill Companies, Inc. acquired Standard & Poor's in 1966 as a subsidiary entity.

19.   Defendant Standard & Poor's Financial Services, LLC is a limited liability company with its principal place of business in New York, New York.  It is also a subsidiary of The McGraw Hill Companies.  Standard & Poor's is "nationally recognized statistical rating organization" or NRSRO, that holds approximately a 40% share of the worlds credit ratings market.

## CLASS ACTION ALLEGATIONS

20.   Plaintiffs bring this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities who acquired the Rated Stock between May 13, 2008 and September 8, 2008 (the "Class Period") pursuant and/or traceable to the false and misleading information provided in (and omitted from) the Offering Circular and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, there are likely hundreds of thousands of investors who purchased the Rated Stock and are members of the proposed Class. Holders of the Rated Stock and other members of the Class may be identified from records maintained by Fannie Mae or its transfer agents and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

     22.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants wrongful conduct in violation of law that is complained of herein.

     23.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

     24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants omitted and/or misrepresented material facts about the Rated Stock; and to what extent the members of the Class have sustained damages and the proper measure of damages.

     25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

     26.    S&P is a credit-rating agency that provides its allegedly impartial ratings to public and private securities.

27.   S&P has historically been viewed as a conservative entity that provided unsolicited evaluations of the creditworthiness of corporations.   S&Ps imprimatur has been essential to investors seeking reliable independent information regarding a security.

28.   In 1975 the SEC provided S&P a special status of a "nationally recognized statistical rating organization" or NRSRO.  The SEC noted that the "single most important criterion [to granting NRSRO status is that] the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities." Furthermore, "the rating organizations independence from the companies it rates" is a critical factor in awarding any entity NRSRO status.

29.   Further perpetuating S&Ps alleged independence, S&P President, Deven Sharma, testified before Congress on October 22, 2008 that "[S&Ps] core mission is to provide the markets with quality, independent analysis" and "independence is a core principle of our business."

30.   Former S&P Vice President Vickie A. Tillman similarly wrote in a letter to the editor of The Wall Street Journal on September 17, 2007, that "[o]ur credit ratings provide objective, impartial opinions on the credit quality of bonds."

31.   And in testimony before Congress on March 20, 2002, Ronald M. Barone, a former S&P Managing Director, stated:

> Standard & Poor's is – and has always been – independent of any investment banking firm, bank or similar organization. . . .  Standard & Poor's is committed to objective ratings by independent rating committees comprised of analysts with credit experience in their areas. . . . Standard & Poor's credit ratings have gained respect and authority throughout the investment community because they are widely understood to be based on independent, objective and credible analysis. . . . Standard & Poor's Commitment to Objectivity [Our] Guidelines and Code stress the overriding importance of objectivity in our ratings process. . . .  Indeed, independence, credibility and integrity are the foundations of the Standard & Poor's ratings business and they are what ultimately provide value to the

marketplace.  Our rating opinions are based on an objective and independent process that we consistently disclose and describe to the marketplace.

32.     Finally in January 2002, S&P published a paper entitled, "Understanding Credit Ratings," in which it represented:

> A Standard & Poor's rating is based on principles of independence, integrity and disclosure – the same standards that underlie market confidence and acceptance of our ratings by investors worldwide.  The rating process is open and clear at Standard & Poor's.  The process remains consistent across different types of ratings and different markets.

33.     Investors justifiably relied upon S&P's status as an NRSRO and believed that S&P provided independent objective ratings.

34.     However, S&P did not provide Plaintiffs and the Class with an independent, objective rating but instead misrepresented the creditworthiness of the Rated Stock.

35.     Plaintiffs and other members of the Class were unaware that Fannie Mae had engaged in risky lending practices that put it in a deteriorating financial position.  By 2008, Fannie Mae desperately needed an immediate infusion of capital and therefore chose to issue noncumulative preferred stock to investors in the form of the Rated Stock.

36.     The Rated Stock came with the promise of dividends of 8.25% per year and a stamp of approval from the trusted credit rating agency, S&P.

37.     On May 13, 2008 Fannie Mae published the Offering Circular to investors.  Page 7 of the Offering Circular stated in relevant part: "On May 13, 2008, the ratings on our preferred stock were 'AA-' (Credit Watch Negative) by S&P."  Furthermore, page 50 of the Offering Circular stated in relevant part: "On May 13, 2008, S&P's rating on our preferred stock was 'AA-,' and that rating was on 'CreditWatch Negative.'   An issue which is rated 'AA' is considered by S&P to differ 'from the highest-rated obligations only to a small degree.' According to S&P, 'the obligor's capacity to meet its financial commitment on the obligation is

very strong.' The modifier '-' indicates that the issue ranks in the lower end of the generic category 'AA.'"

38.    S&P has described its AA rating as being able to withstand a severe level of stress such as GDP declines of up to 15%, unemployment levels of up to 20% and stock market declines of up to 70%.

39.    The S&P was critically important to investors here as the Offering Circular was the only information available on the Rated Stock. S&P knew that investors would rely on its representations regarding the Rated Stock in choosing to invest.

40.    By issuing the AA- rating, S&P indicated that the Rated Stock has an extremely low probability of default.

41.    Top rated products, such as the Rated Stock, are commonly understood in the marketplace to be stable, secure and safe. Accordingly, issuers of these so-called "safe" investments are able to pay investors relatively low interest rates.

42.    Without such a high rating, Fannie Mae could not have issued the Rated Stock, which it relied upon to generate much needed capital to offset its mortgage loan losses, as cheaply.

43.    The AA- rating by S&P implied to Plaintiffs and the Class that S&P had conducted a detailed and fact-based analysis, when, in fact, it had not done so.

44.    Absent the imprimatur of S&P, investors would not have invested in the Rated stock or would have demanded a higher dividend for the higher-risk product.

45.    Investors had no way to verify the ratings provided by S&P and thus were forced to rely on the rating provided in making their decision to invest in the Rated Stock. The S&P rating was a critical factor to investors, such as Plaintiffs, in choosing to purchase the rated stock.

46.     S&Ps rating was false and misleading when made.

47.     The S&P rating contained in the Offering Circular was an essential element to investors when choosing to invest in the Rated Stocks.

48.     Furthermore, S&P continued to mislead investors throughout the Class Period by at all times publically stating that the Rated Stock was rated "AA-."  The Standard & Poor's Rating Services website maintains a search engine where shareholders can obtain the rating for any security rated by S&P.   The website maintained that the Rated Stock was rated "AA-" throughout the Class Period.

49.     Less than four-months after S&P provided its favorable rating to the Rated Stock, its rating was proven false and the investments become essentially worthless.

50.     The United States Treasury Department announced takeover plans for Fannie Mae in September 2008.  As a result, the price of the Rated Stock dropped dramatically, falling more than 88% from its initial offering price of $25 per share on May 13, 2008, to $3 per share on September 8, 2008.  In addition, all dividends were ceased.

51.     S&P, which had historically been viewed as an independent source of objective creditworthiness, provided unreasonably high ratings in part because it had actually suffered from debilitating conflicts of interests.  S&P was paid by the issuer of the Rated Stock.  As such, S&P was under strong competitive and financial pressures to deliver favorable evaluations of the Rated Stock.

52.     The competitive and financial pressures facing S&P served as motive for S&P to provide unwarranted favorable ratings.

53.     Examples of S&Ps debilitating conflicts of interests began to surface in 2008 in the context of its ratings of mortgage-backed securities.

54.    For example, Frank Raiter, Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P from March 1995 to April 2005, stated that S&P had developed models that accounted for the new type of mortgage products available after 2000. These models better captured the changes in the post-2000 mortgage landscape and were therefore better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&Ps revenues.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new subprime products" and the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."

55.    Deven Sharma, President of S&P through September 2011 also admitted: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

56.    Former Chairman of the SEC, Arthur Levitt, Jr., told the audience at an Ontario forum for securities regulators and market participants to discuss important capital markets issues on November 27, 2007 that the credit agencies, such as S&P, had changed their business models resulting in a conflict of interest.  Levitt in speaking about the subprime crisis stated:

> First, consider the credit rating agencies.
>
> Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated ... and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

Now, investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate. And as complex, structured debt products have increased in popularity, the relationship between rater and issue became even closer-and the line between independent rater and paid advisor became blurred.

This very circumstance suggests that a potential conflict of interest - between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies judgment. That they are both coach and referee.

57.    Former Chairman of the SEC, Christopher Cox, provided a statement to Congress

on April 22, 2008, that said:

The rating agencies performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

58.    On June 11, 2008, former Chairman Cox made the following remarks concerning

the rating agencies, including S&P:

When the Congress passed the Credit Rating Agency Reform Act a year and a half ago, it was well understood that certain conflicts of interest were hardwired into the rating agency business model. But we have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute. That's because structured products were specifically designed for each tranche to achieve a particular credit rating- and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings. Selling consulting service to entities that purchased ratings became a triple-A conflict of interest.

59.    On September 25, 2008 Bloomberg reported that S&P was taking on new

business despite the fact it was not appropriate. The article quoted a former S&P Managing

Director stating "I knew it was wrong at the time" but "It was either that or skip the business.

That wasn't my mandate. My mandate was to find a way. Find the way." Another former S&P

Managing Director commented "[S&P] thought they had discovered a machine for making money that would spread the risks so far that nobody would ever get hurt."

60.     The United States House Oversight Committee conducted an investigation into the 2008 subprime crisis and the role of the rating agencies, such as S&P.  As part of the Committee's investigation it unearthed an instant message conversation between two S&P analysts from April 2007:

> *Rahul Dilip Shah*: btw: that deal is ridiculous
> *Shannon Mooney*: I know right ... model def does not capture half of the risk
> *Rahul Dilip Shah*: we should not be rating it
> *Shannon Mooney*: we rate every deal
> *Shannon Mooney*: it could be structured by cows and we would rate it
> *Rahul Dilip Shah*:  but theres a lot of risk associated with it- I personally dont feel comfy signing off as a committee member.

61.     In a December 15, 2006 email, a S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and even bigger monster-the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters."

62.     Despite all these warning signs, S&P was not held accountable for its rating of non-mortgage backed securities such as the Rated Stock.  While the Rated Stock was not a traditional mortgage-back security, and thus not in the spotlight when the actions of S&P first started to come to light, the Rated Stock was a product created for the sole purpose of generating revenue to offset Fannie Mae's risky mortgage loans that were quickly failing.  S&P knew or should have known that Fannie Mae was a house of cards and that it would not be able to sustain the so-called safe investment offered in the form of the Rated Stock.

63.     Plaintiffs and the Class did not know that S&Ps ratings were false and misleading and had no basis in fact when made.  It was only recently after numerous legal findings that

S&P's ratings have no basis and are founded on unreliable methodologies, that Plaintiffs and other members of the Class were on notice that the ratings provided by S&P were fraudulent.

64.     For example, on November 15, 2012 the SEC issued a report on the credit-rating industry that revealed that NRSROs, such as S&P, broke SEC regulations and internal policies in connection with the issuance of its ratings.

65.     As a result of the investigation the SEC issued its first industry-wide "Dear DCO" letter to the designated compliance officers from each agency, including S&P.

66.     This was the first time the SEC took action against S&P for its irresponsible rating of securities and the first time investors were able to discover that S&P's rating practices were fraudulent.

67.     The SEC stated that the letter "urges NRSROs to review SEC rules on preventing the misuse of material nonpublic information and avoiding unfair, coercive or abusive practices with respect to credit ratings."

68.     Furthermore, S&P was recently held accountable for its fraudulent misstatements in connection with rating certain debt obligations after losing a trial in Australia.  There, the Federal Court of Australia found that S&Ps ratings were "misleading and deceptive and involved the publication of information or statements false in material particulars and otherwise involved negligent misrepresentations."

69.     Plaintiffs and other members of the Class were unaware of S&Ps conflicts and misleading and deceptive practices in the rating of the Rated Stock.  Based on information and belief, S&P knew or should have know the Rated Stock was not of the high quality represented as evidenced by the fact that the United Stated government placed Fannie Mae in conservatorship and stopped all preferred dividends on the Rated Stocks less than four months

after S&P provided its favorable rating.   As a result of S&Ps fraudulent and misleading statements, Plaintiffs and other members of the Class suffered damages.

**COUNT I**
**Claim for Common Law Fraud**
**Against All Defendants**

70.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

71.    This is a claim for common law fraud against S&P.

72.    S&P assigned materially false and misleading credit ratings to the Rated Stock. These false and misleading ratings were communicated to, and relied on by, Plaintiffs and each member of the Class.

73.    The misrepresentations made by S&P to Plaintiffs and other members of the Class were identical.   Plaintiffs and the other members of the Class therefore relied on the exact same misrepresentation that the Rated Stock was of "AA-" quality.

74.    S&P made the false and misleading statements to Plaintiffs and members of the Class in the Offering Circular provided to Class members to market the Rated Stock and throughout the Class Period on the Standard & Poor's Rating Service website.

75.    S&P made the false and misleading statements on or about the date the Offering Circular was distributed to Plaintiffs and members of the Class.

76.    Such statements and the reasons why they are false and misleading are set forth with particularity above.

77.    S&P knew or recklessly disregarded the false and misleading nature of its misrepresentations and omissions.

14

78.     S&P made the materially misleading statements and omissions for the purpose of inducing Plaintiffs and the members of the Class to buy and retain the Rated Stock.

79.     Plaintiffs and the Class justifiably relied on S&Ps materially misleading statements and omissions as they went to the core of their investment decision regarding the Rated Stock - namely, the nature of risk associated with the Rated Stock, and the determination of whether the respective dividends associated with the Rated Stock adequately compensated investors for those risks.  The Rated Stock would have been unmarketable and would not have issued but for S&Ps misleading statements and omissions concerning the ratings of the Rated Stock.

80.     S&Ps misrepresentations and omissions went to the credit quality of the Rated Stock.  When the truth regarding the financial health of Fannie Mae was revealed and the United States government planned to takeover Fannie Mae, the per share price of the Rated Stock plummeted and the dividends were ceased.

81.     S&P continued throughout the Class Period to conceal information about the credit quality of the Rated Stock.

82.     S&P undertook to sell and communicate their rating services to the Rated Stock investors through the Offering Circular.  Having elected to make representations to those investors in and having received compensation therefore, S&P owed such investors a duty to disclose all material information, including adverse information.

83.     S&P was in a superior position to investors as a consequence of the rating and monitoring of collateral assets.

84.     Knowing that investors trusted that allegedly objective nature of S&Ps ratings and knowing that such investors were sold Rated Stock that were represented to be secure and stable

investments, S&P had a duty to report to Rated Stock investors that their investment capital and income was at risk due to increasingly deteriorating financial conditions, facts that were concealed from Plaintiffs and the Class members by the false credit ratings assigned to the Rated Stock.

85.     Plaintiffs and all of the Class members have been injured as a result of S&Ps fraudulent conduct and misrepresentations, in an amount to be determined at trial.

## COUNT II
## Claim for Negligent Misrepresentation
## Against All Defendants

86.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

87.     This is a claim for negligent misrepresentation against the S&P.

88.     S&P negligently and recklessly misrepresented material facts regarding the Rated Stock, under circumstances where S&P either knew or reasonably should have known that the representations were not true.   These misrepresentations were contained in written materials distributed to each Class member, including Offering Circular and on the Standard & Poor's Rated Service website.

89.     The Offering Circular was reviewed and approved for distribution to the Rated Stock investors, who were told to rely upon them.   S&P knew at all times that Rated Stock investors to whom the Offering Circular was provided would and did rely upon their representations and omissions.   S&P also knew that its identical continued representations and omissions of the Standard & Poor's Rated Service website would be relied upon by investors.

90.     The Offering Circular and website contained materially false and misleading statements and omissions as alleged above.

16

91.     The Class relied upon the Offering Circular and the Standard & Poor's Rated Service website and the statements contained therein.  It was the reasonable expectation of the Class  – as is common industry practice and sound business practice – that the S&P would update the Offering Circular to reflect material changes in the Rated Stock by, at the very least, issuing a "supplement" when data demonstrated that the Fannie Mae was on the verge of financial collapse.

92.     All members of the Class took action and/or refrained from taking action on the basis of the S&P negligent and/or malicious statements and omissions.

93.     If the S&P had imparted complete and accurate information in the Offering Circular or on the Standard & Poor's Rated Service website, the Rated Stock would have demanded a higher interest rate to compensate investors for the true risk of the investment.

94.     If the S&P had properly updated the Offering Circular or the Standard & Poor's Rated Service website consistent with their duties and undertakings, the Rated Stock investors would have protected their investment capital by insuring against the increased risk or selling their Rated Stock to less risk-averse investors, such as distressed asset investors.

95.     All members of the Class have suffered damages as a result of the S&Ps negligent misrepresentations and/or omissions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Certification of this action as a class action and appointment of Plaintiffs as Class Representatives;

B.     Awarding compensatory damages in favor of Plaintiffs for all damages sustained as a result of defendants wrongdoing, in an amount to be proven at trial, including

interest thereon;

C.    Awarding Plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: December 4, 2012                    **GARDY & NOTIS, LLP**


                                             /s/ Jennifer Sarnelli
                                           Jennifer Sarnelli
                                           Mark C. Gardy
                                           501 Fifth Avenue, Suite 1408
                                           New York, New York 10017
                                           Tel: 212-905-0509
                                           Fax: 212-905-0508

                                           *Attorneys for Plaintiffs*